235 S.W.3d 358 (2007)
In the Interest of N.S.G., A Minor Child.
No. 06-06-00108-CV.
Court of Appeals of Texas, Texarkana.
Submitted July 16, 2007.
Decided September 12, 2007.
*362 John S. Delk, II, Texarkana, for appellant.
Brad Morin, Curry & Morin, PLLC, Marshall, for appellee.
Before MORRISS, C.J., CARTER and MOSELEY, JJ.

OPINION
Opinion by Chief Justice MORRISS.
While his wife, Isis, was pregnant with their daughter, N.S.G., William Green and Isis used illegal drugs together. During the twenty-two months after N.S.G.'s birth, William used drugs, physically abused Isis, brought stolen goods and unsavory characters home, absconded from Texas to Tennessee to avoid arrest, and ultimately was brought back and incarcerated in Texas for burglary. William's actions *363 produced three principal results: (a) William's and Isis's ejection from the home of William's sister, Patricia Arnold, and Patricia's husband, Jerry Arnold; (b) N.S.G.'s residence with the Arnolds, but not with William or Isis, the vast majority of her young life; and (c) William's failure to support N.S.G.
William appeals from the termination of his parental rights to N.S.G.,[1] the termination action having been instituted by the Arnolds. William contends that the evidence is legally and factually insufficient to support the termination. We disagree and affirm the termination because we conclude that (1) sufficient evidence established at least one substantive ground under Section 161.001 of the Texas Family Code and (2) sufficient evidence established that termination was in the best interest of N.S.G.
Although the petition for termination listed a variety of grounds for termination,[2] only one statutory ground along with a finding that termination is in the best interest of the childis required to be adequately proven to support an order of termination. In re N.R., 101 S.W.3d 771, 774 (Tex.App.-Texarkana 2003, no pet.). The trial court found that William did four things:
(1) voluntarily left [N.S.G.] alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of [N.S.G.], and remained away for a period of at least three months;[3] [ground (B)]
(2) voluntarily left [N.S.G.] alon[e] in the possession of another without providing adequate support of [N.S.G.] and remained away for a period of a[t] least six months;[4] [ground (C)]
(3) knowing[ly] placed or knowing[ly] allowed [N.S.G.] to remain in conditions or surroundings that endanger the physical or emotional well-being of [N.S.G.];[5] [ground (D)] and
(4) engaged in conduct or knowing[ly] placed [N.S.G.] with persons who engaged in conduct that endangers the physical or emotional well-being of [N.S.G.][6] [ground (E)].
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006); In re J.F.C., 96 S.W.3d 256, 263 (Tex.2002). The "clear and convincing proof" standard is an intermediate one, situated between the "preponderance of the evidence" standard of ordinary civil proceedings and the "beyond a reasonable doubt" standard of criminal proceedings. In re G.M., 596 *364 S.W.2d 846, 847 (Tex.1980). Evidence is clear and convincing when the proof is such that it produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. In re C.H., 89 S.W.3d 17, 25-26 (Tex.2002).
In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); J.F.C., 96 S.W.3d at 266; C.H., 89 S.W.3d at 25. Looking at the evidence in the light most favorable to the judgment means that we must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. A corollary to this requirement is that a court should disregard all evidence contrary to the judgment that a reasonable finder of fact could have disbelieved or found to have been incredible. J.F.C., 96 S.W.3d at 266. In conducting a legal sufficiency review in a parental rights termination case, however, we must consider all of the evidence, not just that which favors the verdict. In re J.P.B., 180 S.W.3d 570, 573 (Tex.2005). If we determine that no reasonable fact-finder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent. J.F.C., 96 S.W.3d at 266; see TEX.R.APP. P. 43.3.
When reviewing a factual sufficiency challenge to a parental rights termination, we consider the evidence the fact-finder could reasonably have found to be clear and convincing. See J.F.C., 96 S.W.3d at 266; C.H., 89 S.W.3d at 25-26. In applying this standard to a trial court's findings, we ask whether there was sufficient evidence presented to produce in the mind of a rational fact-finder a firm belief or conviction as to the truth of the allegations sought to be established. C.H., 89 S.W.3d at 25; N.R., 101 S.W.3d at 774. In reviewing termination findings for factual sufficiency, we must give due deference to the fact-findings at the trial level, as in C.H., and should not supplant the fact-finder's judgment with our own. C.H., 89 S.W.3d at 27; see Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." J.F.C., 96 S.W.3d at 266. In applying this standard, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." C.H., 89 S.W.3d at 26 (citing Santosky v. Kramer, 455 U.S. 745, 767-69, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). We must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. J.F.C., 96 S.W.3d at 266. We must also disregard all evidence that a reasonable fact-finder could have disbelieved. Id. We must consider, however, undisputed evidence even if it is contrary to the finding. Id. That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.2005).
The evidence shows that Isis gave birth to N.S.G. in December 2004 in Odessa, Texas, where William and Isis had driven to visit friends, arriving just shortly before the birth. William testified that his wife *365 had been using marihuana and cocaine for the first three months of her pregnancy, before they learned of her pregnancy. He also testified that he was using drugs with Isis and that the burglary which resulted in the issuance of the warrant for his arrest occurred while Isis was pregnant with N.S.G. When N.S.G. was born, tests revealed that Isis had marihuana in her blood but that N.S.G. did not.
William, Isis, and N.S.G. returned to Linden from Odessa two days after the birth and moved in with the Arnolds, the petitioners in this action for termination. On December 15, William signed an agreement to place N.S.G. with Patricia. He also agreed to undergo a drug assessment on January 6, 2005, and had agreed to stay in the Arnolds' home until the investigation was complete. Despite these agreements, William left the area and went to Tennessee, leaving N.S.G. with Patricia. Isis testified that, two days after N.S.G.'s birth, William committed a burglary and that, after N.S.G.'s birth, William was ejected from the Arnolds' household. The evidence shows that William voluntarily left N.S.G. with the Arnolds when he left Texas to evade the outstanding arrest warrants; there is no evidence that he expressed an intent to return (other than a statement at trial that he intended to return after he had saved sufficient money to hire a lawyer to contest his burglary charge).
N.S.G. (twenty-two months old at the time of trial) had lived in the Arnolds' household since she was five days old. Although there is some contradiction in the testimony whether William or Isis first ceased living at the Arnold home, it is clear that both William and Isis left the home within the first week of their arrival and that they left N.S.G. with the Arnolds when they left the home.
Isis testified that William was ordered out of the Arnold house because he had been using drugs while living there. Jerry's testimony added that William had also "roughed up" Isis, had brought stolen goods into the house, and had allowed some of William's unsavory friends into the house, all in violation of conditions which Jerry had placed on William's residency there.
Isis had attempted to take N.S.G. from the day care center operated by Patricia, but was prevented from doing so by representatives of the Child Protective Services agency of the Texas Department of Family and Protective Services (CPS) until after she had received a drug assessment and had participated in counseling. Until Isis complied with these requirements, her contact with N.S.G. was to be restricted to supervised visitation. Instead of complying, she and William drove to Tennessee. William and Isis freely admit that the reason they hurriedly left Texas and went to Tennessee was for the purpose of avoiding William's arrest and prosecution for the felony charge of burglary. William testified that they had left N.S.G. with the Arnolds because CPS would not allow Isis to take the baby away from the Arnolds' day care center because of her alleged drug use. Patricia testified that both William and Isis lived with her and her husband very briefly after N.S.G. was born, but then left and went to Tennessee. She further indicated that neither William nor Isis communicated with the Arnolds about N.S.G. during the six weeks they were on the run from police in Tennessee. The testimony also showed that, during the first twenty-two months of N.S.G's life, William and Isis had spent perhaps a week with N.S.G.
Despite their flight, William and Isis were both arrested January 28, 2005, and were brought back to Texas from Tennessee. *366 For all but six weeks of N.S.G.'s life up to the time of trial, William and Isis had each been incarcerated. At the time of trial, William and Isis were each still incarcerated; both participated in the hearing under bench warrants issued for that purpose.
The evidence shows that neither William nor Isis ever provided any support for N.S.G., either during or after the six weeks they were on the run. There is evidence that William left N.S.G. with the Arnolds for over six months without providing any support.[7] There is no evidence that William made an attempt to do anything for the benefit of N.S.G. during the period of time beginning when he left N.S.G. with his sister until the trial of the termination proceeding. During the approximately six weeks that William was in Tennessee, he made no effort to monitor the condition of N.S.G. and had very little contact with the Arnolds about N.S.G. while he was incarcerated in Texas. The sole evidence of any action by William directed toward N.S.G., after leaving her with the Arnolds, is his participation in defending the termination action and filing this appeal. Little evidence suggests that he had any plan in place to return from Tennessee or to seek to recover N.S.G. His return to Texas was compelled by law enforcement action and was not due to any choice of his own. William also, however, testified that he paid nothing toward the support of N.S.G. because he had nothing with which to pay during his six weeks of freedom; according to his testimony, after his arrest, he remained imprisoned and, thus, had no funds to send for her support. William was incarcerated during the last twenty months of the first twenty-two months of N.S.G.'s life. That incarceration, coupled with the extremely young age of N.S.G., considerably limited his options regarding her care or support.
In proceedings to terminate the parent-child relationship brought under Section 161.001 of the Texas Family Code, the petitioner must establish by clear and convincing evidence one or more of the acts or omissions enumerated under subdivision (1) of the statutethat is, one or more "grounds"and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001; Richardson v. Green, 677 S.W.2d 497, 499 (Tex.1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. J.F.C., 96 S.W.3d at 277; Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). We conclude that both elements were established.
(1) Sufficient Evidence Established at Least One Substantive Ground Under Section 161.001
We first address the sufficiency of the evidence to prove that William has committed one of the actions required by Section 161.001(1) to justify termination of his parental rights to N.S.G. As previously mentioned, four grounds were alleged. We hold that ground (E) was adequately proven.
Ground (E) allows for termination on proof that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(E). Ground (E) "refers only to the parent's conduct, as evidenced not only by the parent's acts, *367 but also by the parent's omissions or failures to act." In re S.K., 198 S.W.3d 899, 902 (Tex.App.-Dallas 2006, pet. denied). "The conduct to be examined includes what the parent did both before and after the child was born." Id.
"Endanger" means
more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Rather, "endanger" means to expose to loss or injury; to jeopardize and imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.
Boyd, 727 S.W.2d at 533 (citations omitted). Endangerment can occur through both acts and omissions. Neglect can be just as dangerous to the child's emotional and physical health as intentional abuse.
Subsection E [of the termination statute] focuses on the parent's conduct alone, including acts and omissions. While the endangerment must be a direct result of the parent's course of conduct, the conduct does not have to be directed toward the child, nor does the child have to suffer actual injury for the finding to be upheld. Similarly, the conduct does not have to cause a concrete threat of injury to the child. If the evidence shows that the parent has engaged in a course of conduct which has the effect of endangering the child, then the finding under subsection E may be upheld.
In re A.J.H., 205 S.W.3d 79, 81 (Tex.App.-Fort Worth 2006, no pet.) (quoting In re W.J.H., 111 S.W.3d 707, 715-16 (Tex.App.-Fort Worth 2003, pet. denied)).
Subsection (E) does not require there be danger of physical harm; endangering a child's emotional well-being alone is sufficient. In re S.H.A., 728 S.W.2d 73, 83-85 (Tex.App.-Dallas 1987, writ ref'd n.r.e.); see Allred v. Harris County Child Welfare Unit, 615 S.W.2d 803, 806 (Tex. Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.) (conduct, abusing mother during pregnancy and violating parole conditions which caused parent to be incarcerated, endangered emotional well-being of child).
It has long been settled that imprisonment, standing alone, does not constitute "abandonment" of a child for purposes of termination of parental rights. Boyd, 727 S.W.2d at 533 (imprisonment alone does not endanger child); In re D.T., 34 S.W.3d 625, 634 (Tex.App.-Fort Worth 2000, pet. denied); In re S.D.H., 591 S.W.2d 637, 638 (Tex.Civ.App.-Eastland 1979, no writ) (imprisonment does not constitute "abandonment," nor is it conduct "endangering" a child); H.W.J. v. State Dep't of Public Welfare, 543 S.W.2d 9, 11 (Tex.Civ.App.-Texarkana 1976, no writ) (same); Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex.Civ.App.-Beaumont 1971, no writ) (imprisonment is not "abandonment"). Though imprisonment of a parent is insufficient, standing alone, to constitute "engaging in conduct which endangers the emotional or physical well-being of the child," it is a factor to consider on the issue of endangerment. Boyd, 727 S.W.2d at 533-34; In re M.D.S., 1 S.W.3d 190, 199 (Tex.App.-Amarillo 1999, no pet.).
On the other hand, if the evidence, which includes imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under Section 161.001(1)(E) is supportable. Boyd, 727 S.W.2d at 533-34; M.D.S., 1 S.W.3d at 199; Wray v. Lenderman, 640 S.W.2d 68, 71 (Tex.App.-Tyler 1982, no writ). "[C]onduct that subjects a child to a life of uncertainty and instability endangers *368 the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." A.J.H., 205 S.W.3d at 81 (quoting In re R.W., 129 S.W.3d 732, 739 (Tex.App.-Fort Worth 2004, pet. denied)).
There is ample evidence that William engaged in activitiesillegal and otherwisethat resulted in this type of uncertainty in the life of N.S.G. See A.J.H., 205 S.W.3d at 81; see also In re S.T., 127 S.W.3d 371, 378-79 (Tex.App.-Beaumont 2004, no pet.). After N.S.G.'s birth, William engaged in criminal activity (burglary), "roughed up" Isis, failed to submit to drug counseling, and engaged in the taking of illicit drugs. Because of William's actions while residing with the Arnoldsdrug use, abuse of Isis, possession of stolen goods at the Arnold home, and allowing unsavory characters into the home William broke his agreement with the Arnolds and thus disqualified himself from continued residence, with N.S.G., at the Arnold home. William's pattern of conduct which has been severe enough to cause his incarcerationnot to mention his disqualification from residence with the Arnolds, the one place he could have lived with N.S.G. with his limited circumstancescan certainly be sufficient for the trial court to have based its determination that his course of conduct endangers the emotional well-being of N.S.G. and supports termination of his parent-child relationship.[8]C.H., 89 S.W.3d at 28 (pattern of conduct inimical to child-rearing; including failure to support emotionally and pattern of criminal activity and separation from child after child's birth); see In re *369 H.G.H., No. 14-06-00137-CV, 2007 WL 174371, at *5, 2007 Tex.App. LEXIS 476, at *14-15 (Tex.App.-Houston [14th Dist.] Jan. 25, 2007, no pet.) (mem. op.) (parent's "life choices have left him unable to provide a safe and stable home," "unable to care for," "pattern of conduct inconsistent with the very idea of child-rearing," parent incarcerated majority of child's life for crimes committed before and after birth of child, termination affirmed).
(2) Sufficient Evidence Established that Termination Was in the Best Interest of N.S.G.
William also argues that there was insufficient evidence to allow the court to find that it was in the best interest of N.S.G. to terminate his parental rights. This portion of our review proceeds from the policy-based presumption that the best interest of a child is usually served by preserving the parent-child relationship. G.M., 596 S.W.2d at 847; see Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). In determining the child's best interest, the fact-finder may consider the current and future physical and emotional needs of the child, the current and future physical and emotional danger the child may confront with his or her parent, and the parental abilities of the individual seeking custody. Some factors which may be considered when determining the best interest of a child include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976); see In re R.M., 180 S.W.3d 874, 879 (Tex. App.-Texarkana 2005, no pet.).
Of course, in this circumstance, the desires of the child cannot be determined because of her age. The emotional and physical needs of N.S.G. would clearly be very well met with the Arnolds, as acknowledged by both Isis and William and ratified by their decision to leave N.S.G. with them; this was also shown by the evidence of the stability of the Arnold home and the fact that Patricia owns and operates a State-licensed child-care facility. Emotional and physical danger to N.S.G. caused or potentially caused by William's prior and continued criminal behavior[9] is a factor to be considered. William's decision to commit additional crimes and to use drugs after N.S.G.'s birth and his decision to leave her (albeit in a safe, State-approved place) while he was attempting to avoid arrest also mitigate against William's case. Likewise, his wife's use of illicit drugs without any intervention by William and his physical abuse of his wife weighs against him. Finally, when William was questioned about any plans he might have that would allow him to become a parent to N.S.G., he only responded generically by testifying that he intended to be a good parent and that he believed he could get an oil-field job after getting out of jail.
Under the standards as set out above, we conclude that there is both legally and *370 factually sufficient evidence to allow the trial court to determine that the best interest of N.S.G. was served by the termination of William's parental rights. Therefore, Section 161.001(2) of the Texas Family Code has been met. See TEX. FAM. CODE ANN. § 161.001(2).
We affirm the judgment terminating William's parental rights to N.S.G.
Dissenting Opinion by Justice MOSELEY.
I must respectfully dissent.
A parent's right to "the companionship, care, custody, and management" of his children is a constitutional interest "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children  is perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985).
As a consequence of the gravity of this parental right, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." Id. Because termination "is complete, final, irrevocable and divests for all time that natural right . . . the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." Id. (citing Santosky, 455 U.S. at 747, 102 S.Ct. 1388; Richardson v. Green, 677 S.W.2d 497, 500 (Tex.1984) (superseded by statute on other grounds)). This standard of clear and convincing evidence to support termination is also required by statute. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2006). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002). The clear and convincing standard is intentionally placed on the party seeking termination because of the severity and permanence of the termination of the parent-child relationship. Harris v. Herbers, 838 S.W.2d 938, 941 (Tex.App.-Houston [1st Dist.] 1992, no writ) (only the heightened standard of review for the clear and convincing standard set forth in Harris was overruled by In re J.N.R., 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no writ)).
This Court has pointed out previously in In re R.M., that there are two considerations to take into account in the involuntary termination of the parent-child relationship: "A court may order involuntary termination only if the court finds that: (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child." In re R.M., 180 S.W.3d 874, 877 (Tex.App.-Texarkana 2005, no pet.) (quoting TEX. FAM.CODE ANN. § 161.001; In re B.L.D., 113 S.W.3d 340, 353-54 (Tex. 2003)).
Best Interest of the Child
There is a strong presumption that the best interest of a child is usually served by keeping custody with the natural parents. McGowen v. State of Texas, 558 S.W.2d 561 (Tex.Civ.App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.). However, once evidence is produced to support a finding of *371 the nonexistence of that presumed fact, the case will proceed as if no presumption exists. McGuire v. Brown, 580 S.W.2d 425 (Tex.Civ.App.-Austin 1979, writ ref'd n.r.e.). I concur that the trial court's finding that the best interest of N.S.G. would dictate that the termination occur, opening the door to an adoption by Patricia and Jerry Arnold, the applicants for the termination of William's parental rights.
However, the finding of the child's best interest only meets one of the two requirements which must be met in order to terminate the parent-child relationship; there must also be some bad action on the part of the parent as well to precipitate the termination.
While the Texas Family Code (Section 161.001) enumerates some twenty different actions or courses of conduct a parent might take which would generate bases for termination of his relationship with a child, it is silent in defining what should be considered by a court in determining the best interest of a child in that relationship.[10] Therefore, one would assume that there is more discretion vested in the fact-finder in determining the best interest of the child than in determining whether the parent had committed a predicate act which justifies the termination.
Failure to Provide Adequate Support
In this case, the trial court set out four different grounds for the termination of William's parent-child relationship with N.S.G. The first two grounds listed in the judgment of termination are those set out in Sections 161.001(1)(B) and (C). Those two grounds for termination share the common requirement that the parent has not seen to the provision of "adequate support for the child" while having "voluntarily left the child alone or in the possession of another" for a period of time.
In order to have met the burden of proof, it was necessary for the Arnolds to prove by clear and convincing evidence that William had not provided adequate support for N.S.G. A requisite of that proof that William had committed the act of leaving N.S.G. with another person "without providing for the adequate support of the child," the Arnolds were also required to show that William possessed the ability to provide that support. See Brokenleg v. Butts, 559 S.W.2d 853, 856 (Tex.Civ.App.-El Paso 1977, writ ref'd n.r.e.); see also In re E.M.E., 234 S.W.3d 71 (Tex.App.-El Paso 2007, no writ); In re Z.W.C., 856 S.W.2d 281, 283 (Tex.App.-Fort Worth 1993, no writ).[11]
*372 The uncontradicted testimony of William was that for the six weeks immediately after he had left the child with the Arnolds (his sister and her husband), he was earning inadequately to provide support for N.S.G. and, from that time forward until the time of trial, he had been incarcerated with no source of funds with which to pay. There was no evidence adduced at the trial that William had the ability to provide adequate support for the child at any point since she was born; contrarily, there was uncontradicted evidence that he had no such ability at any time since he left N.S.G. in the care of the Arnolds to provide support for her.
In an action for contempt of court for a failure to pay court-ordered child support, a nonpaying parent can interpose the inability to pay as an affirmative defense to a contempt action. See TEX. FAM.CODE ANN. §§ 157.006, 157.008(c) (Vernon 2002). However, this is not an enforcement action but, rather, it is a termination action, governed by an entirely different part of the Code, Section 161.001, which (1) is devoid of any language regarding affirmative defenses, (2) includes as an element of termination the failure to pay in accordance with ability, and (3) demands that each finding required for termination of the parent-child relationship be based on clear and convincing evidence. In re D.S.P., 210 S.W.3d 776, 781 (Tex.App.-Corpus Christi 2006, no pet.). The proponents of the termination failed in their proof of this vital element of those grounds to support their cause of action under either of the two "failure to support" bases.
Endangerment of the Child by Conditions or Surroundings
The third ground for termination which the trial court found is that which is set out in Section 161.001(1)(D) of the Texas Family Code ("knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child"). As with the evidence that William had no means to provide adequate support for the child, the evidence is likewise uncontroverted that the Arnolds provide an idyllic home for N.S.G. When William and Isis went "on the lam" to avoid arrest for burglary, they left N.S.G. in excellent surroundings under the care and custody of people who apparently have continued to constantly provide her with physical and psychological sustenance, ideal for her care and upbringing. There is simply no evidence that the conditions or surroundings in which they placed N.S.G. endangers either her physical or emotional well-being; contrarily, the evidence is that her well-being is and has been quite good. Therefore, there is no evidence upon which a fact-finder could reasonably have formed a firm conviction or belief that William endangered N.S.G.'s physical or emotional well-being.
Knowingly Engaged in Conduct or Knowingly Placed the Child With Persons Who Engage in Conduct Which Endangers the Child
Finally, we reach the fourth ground for termination as found by the trial court and the sole ground upon which a judgment of termination could possibly vest, that being the ground set out in Section 161.001(1)(E) of the Texas Family Code ("engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child").
It is true that the evidence shows that William committed a burglary, engaged in the taking of illicit drugs, took unlawful flight to avoid prosecution, and "roughed up" Isis after the birth of N.S.G. It is for these reasons that William found himself being ejected from the Arnold home, leaving N.S.G. with the Arnolds while he and *373 Isis went to Tennessee, and was finally incarcerated.
There is no need to reiterate that the surroundings in which William left N.S.G. were favorable to the child. There is no evidence that he knowingly placed the child with persons who engaged in conduct which endangered her. Therefore, we must look at the conduct of William himself.
The proponents of termination of William's parental rights did not allege the grounds for termination set out in Section 161.001(1)(Q) ("knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition"), nor did the trial court find that ground as the basis for the termination. Because that ground was not mentioned in either the pleadings or in the trial court's finding as a basis for termination of William's parental rights, we cannot consider it. Ruiz v. Tex. Dep't of Family & Protective Servs., 212 S.W.3d 804, 812 (Tex. App.-Houston [1st Dist.] 2006, no pet.).
It is true that imprisonment is a factor to consider along with the other evidence. See Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 534 (Tex.1987). However, "the supreme court did not say that endangerment may be inferred from any and all criminal conduct just because that conduct results in imprisonment." In re D.T., 34 S.W.3d 625, 635 (Tex.App.-Fort Worth 2000, pet. denied).
William only had a few weeks of freedom between the time of N.S.G.'s birth and the commencement of his incarceration, which has lasted through the day of trial. One could speculate, given William's lengthy criminal history, that the only reason he did not eventually follow a course of conduct which would ultimately cause him to knowingly engage in conduct which would endanger N.S.G. has been the fact that his incarceration has prevented him from it. However, we cannot engage in speculation (particularly when the burden to be met is that of "clear and convincing" evidence) and must deal with the facts before us; therefore, we must look solely to the approximate six-week period between the time of the birth of N.S.G. and the commencement of William's incarceration.
It would seem that a finding that the conduct of William during the short period of time after the birth of N.S.G., which resulted in his incarceration, is simply too thin a thread to sustain this finding under the clear and convincing standard imposed by the statute. None of his crimes were so heinous so as to shock the conscience nor of such an extended period of time as to show a pattern of behavior which endangers the child. Such a finding seems tantamount to a finding that William's incarceration is per se evidence of the endangerment of the child.[12] As stated above, that is prohibited; this termination sets a lower standard than we should require.
Finally, even though there was evidence at trial of certain crimes and conduct on the part of William, no one ventured testimony that this conduct had the effect of endangering the child; one must infer that. When the burden of proof has been raised by statute and caselaw to the "clear and convincing" standard, I consider it an act of legal limbo to bend backward far *374 enough to go under the bar and say that the burden has been met.
I would reverse the judgment of the trial court.
NOTES
[1] Isis has dismissed her appeal of the termination of her parental rights to N.S.G. Though this appeal is brought by William alone, the case was tried against both William and Isis.
[2] Significantly, the grounds as pled did not include an allegation that William had knowingly engaged in criminal conduct that had resulted in his conviction for an offense and his confinement or imprisonment and inability to care for N.S.G. for not less than two years from the date of filing the petition, which could have allowed termination under Section 161.001(1)(Q) of the Texas Family Code.
[3] See TEX. FAM.CODE ANN. § 161.001(1)(B) (Vernon Supp.2006).
[4] See TEX. FAM.CODE ANN. § 161.001(1)(C) (Vernon Supp.2006).
[5] See TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon Supp.2006).
[6] See TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2006).
[7] Rather than leaving N.S.G. in conditions or surroundings that would likely endanger N.S.G.'s physical or emotional well-being, he left her with the Arnolds. The evidence shows that the Arnold home is a good one and that they care for N.S.G. well.
[8] The Other Grounds. Ground (D) allows for termination on proof that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangers the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D). Ground (D) "refers only to the acceptability of a child's living conditions." S.K., 198 S.W.3d at 902. The Arnolds, with whom William left N.S.G., provide a safe and healthy environment for N.S.G., and neither of them engages in conduct that endangers the physical or emotional well-being of N.S.G. Therefore, the Arnolds themselves, by their meritorious conduct, have taken away the ground alleged that William knowingly placed N.S.G. with persons who engaged in conduct that endangers the physical or emotional well-being of N.S.G. Ground (D) was not adequately proven.

Grounds (B) and (C) are questionable. The evidence is clear that William left N.S.G. with the Arnolds, who were not parents, that he did not express an intent to return at the time, and that he remained away for a period of at least six months, a course of action which appears to qualify under either ground (B) or (C). See TEX. FAM.CODE ANN. § 161.001(1)(B), (C). The question remaining as to each subsection is whether William failed to provide adequate support for N.S.G. within those provisions. The evidence shows that he did not provide any support for her, but it also suggests he was unable to support her. There may be unresolved issues on (1) whether these grounds require proof of the parent's ability to support and (2) whether the evidence shows proper arrangements for support were made with the Arnolds. See In re D.J.J., 178 S.W.3d 424, 429 (Tex.App.-Fort Worth 2005, no pet.) (grounds (C) and (F) involved; court recited lack of proof of ability to support); In re Fite v. Nelson, 869 S.W.2d 603, 607 (Tex.App.-Houston [14th Dist.] 1994, no pet.) (leaving child with one able to provide, without agreement for that person to support for parent, insufficient to show provision of adequate support by parent); see also Holick v. Smith, 685 S.W.2d 18, 21 (Tex.1985) (parent left children with relatives who explicitly agreed to care for them until parent "could get on her feet"; parent made efforts; no termination). But see Roderick v. Tabor, No. 03-98-00075-CV, 1999 WL 125443, 1999 Tex.App. LEXIS 1594 (Tex.App.-Austin Mar. 11, 1999, no pet.) (mem. op.) (distinguishing Holick and holding that ground (C) does not require proof of ability to support). But, because we conclude that ground (E) was adequately proven, we need not decide whether grounds (B) and (C) were properly supported.
[9] He had spent six years of his twenty-five-year life incarcerated in prison, in jail, or in the Texas Youth Commission. He testified that he had two felony convictions for burglary of a habitation and a felony conviction for the unauthorized use of a motor vehicle.
[10] Among the factors which the Texas Supreme Court has suggested that a court can consider in a termination suit in determining the best interest of the child are those set out in Section 263.307 of the Texas Family Code, which deals with actions other than termination. See TEX. FAM.CODE ANN. § 263.307 (Vernon 2002); In re R.R., 209 S.W.3d 112, 116 (Tex.2006).
[11] CAVEAT: It should be noted that each of these cited cases involve, at least in part, findings under Section 161.001(1)(F) of the Texas Family Code, a subsection which provides a ground for termination when the parent has "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition." (Emphasis added.) Subsections (B) and (C) of Section 161.001(1) of the Texas Family Code (which are under discussion here) make no mention of the ability of the parent to provide support; it could, therefore, be said that the cited cases can be distinguished from the circumstance at hand because of the inclusion of the requirement of the ability to provide support in one subsection while it is silent as to the existence of that ability in the others. It does not seem rational or just, however, to place a burden on parents to pay money or provide support which those parentsdue simply to poverty do not have the ability to pay or provide lest they lose their children through termination.
[12] "[A] rose by any other name would smell as sweet." WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2.